UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.:  8:09-bk-03240-CED

In re:

DAVID J. DAMBRO,

Debtor.

_____/

RICHARD K. DIAMOND, CHAPTER 7 TRUSTEE OF
THE BANKRUPTCY ESTATE OF IVDS INTERACTIVE
ACQUISITIONS PARTNERS,                                ADV. PRO. NO.:

          Plaintiff,

v.

DAVID J. DAMBRO a/k/a DAVID JOSEPH DAMBRO,

_____Defendant._____

## COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

COMES NOW, the Plaintiff, RICHARD K. DIAMOND, CHAPTER 7
TRUSTEE OF THE BANKRUPTCY ESTATE OF IVDS INTERACTIVE
ACQUISITIONS PARTNERS, ("Plaintiff"), by and through his undersigned attorneys
and sues the Defendant DAVID J. DAMBRO a/k/a DAVID JOSEPH DAMBRO ("D.
Dambro") and states as follows:

## GENERAL ALLEGATIONS

1.     This Court has jurisdiction over this action and the parties by virtue of 28
U.S.C. §§1334 and 157.  This is a core matter under 28 U.S.C. § 157(b)(2)(A), (I), and
(O).

2.     This is an action seeking the non-dischargeability of debt, pursuant to §523(a)(2), (a)(4) and (a)(6) of the United States Bankruptcy Code (the "Code").

3.     On February 13, 2009 (the "Petition Date"), D. Dambro commenced the above-styled Chapter 7 bankruptcy case by filing a Voluntary Petition for Relief under the provisions of Chapter 7 of the Code, in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division.  The Chapter 7 Trustee in the above-styled case is Lauren P. Greene.

4.     Pursuant to the Notice of Commencement of Case under Chapter 7 of the Code, filed in the above-styled bankruptcy case, the deadline established for filing complaints objecting to the discharge of D. Dambro pursuant to 11 U.S.C. § 727, or to determine dischargeability of certain types of debts, pursuant to 11 U.S.C. § 523, is June 1, 2009.

5.     Plaintiff is the Chapter 7 Trustee in the bankruptcy case of IVDS Interactive Acquisition Partners, Case No. SV-95-19539-AG, U.S. Bankruptcy Court for the Central District of California, San Fernando Division (the "IVDS Bankruptcy Case").

6.     As of the Petition Date, Plaintiff held an unsecured claim against D. Dambro in the total amount of **$6,093,167.68,** consisting of the principal sum of $5,600,000.00, together with accrued interest of $493,167.68.  This debt arises from a Final Judgment dated May 10, 2007, entered in *Richard K. Diamond, as Chapter 7 Trustee, Plaintiff vs. Digital Interactive Associates, Inc., et al., Defendants* (the "IVDS Adversary Proceeding"), by the United States District Court for the Central District of California, Los

Angeles Division, in USDA Case No. VC-00-9980-CBM, Bankruptcy Case No. SV-95-19539-GM; and Bankruptcy Adversary No. AD-97-02050-GM,.

7.    D. Dambro is a resident of Manatee County, Florida, residing at 8455 Miramar Way, Bradenton, FL 34202.

## BACKGROUND

A.    **Formation of IVDS & DIA**.

8.    IVDS Interactive Acquisition Partners, a Florida general partnership ("IVDS"), was formed on or about April 14, 1994 as a general partnership under the laws of the State of Florida.

9.    IVDS's stated business purpose was to:

> (a) acquire by bid, purchase, lottery or otherwise, licenses and to own and/or operate a specialized radio system under the Federal Communications Commission ("FCC") Interactive Video and Data Services ("IVDS") License; (b) to acquire, through contract, ownership, or lease, or otherwise, all necessary equipment, plants, offices, or other facilities or assets necessary to operate such systems under IVDS License; and (c) to carry out the business of ownership, management and operation of the acquired systems.

10.    In or around April of 1994, D. Dambro masterminded and put into place a scheme that included the formation of IVDS and Digital Interactive Associates, Inc. ("DIA"), and was designed to solicit investments in IVDS using the services of other persons or entities controlled by D. Dambro.

11.    Pursuant to D. Dambro's master plan, IVDS would raise $6,000,000, sixty percent (60%) of which would go to DIA (a corporation created for the express purpose of soliciting investments in IVDS), and other entities designated by D. Dambro as sales

concessions.

12.    D. Dambro arranged for the preparation of a Partnership Agreement for IVDS, in which IVDS did not disclose to potential investors that DIA and others would take 60% of every dollar collected from investors in IVDS.  The IVDS Partnership Agreement does not provide any information to investors as to what IVDS's intentions were with respect to disposition of IVDS's capital.[1]

**B.    Solicitation of Investors through DIA and MLG**

13.    As set forth above, DIA was a corporation created under the direction of D. Dambro for the express purpose of soliciting investments in IVDS.

14.    DIA was a "boiler room" and "telemarketing firm," located in Denver, Colorado, and charged with raising $6,000,000 for IVDS.  Beginning in or around April of 1994, DIA, through Market Logistics Group, Inc. ("MLG"), began to solicit potential investors in IVDS.  MLG was owned and operated by Michael Dambro ("M. Dambro"), the brother of D. Dambro.

15.    M. Dambro formed MLG at the suggestion of D. Dambro.  D. Dambro hired MLG and M. Dambro to assist DIA to solicit investments in IVDS.  MLG generated "leads" for IVDS by purchasing mailing lists and by mailing an unsolicited promotional "newsletter" by the name of "The Inside Edge" to many households throughout the United States.  "The Inside Edge," which was written by and produced by

---

[1]    In fact, no documents distributed to investors disclosed that IVDS intended to pay out $3,600,000, or sixty percent (60%), of IVDS's funds, as compensation to DIA and others for soliciting investments in IVDS.

MLG, solicited the recipients to either call an "800" number or return a pre-paid, tear-out card (the "Card") to obtain more information and a free gift.

16.     Upon return of the Card or a call to the "800" number, DIA sales personnel telephoned potential investors.    Using scripts, DIA personnel attempted to solicit investments in IVDS.

17.     D. Dambro, through his consulting company, Market Dynamics Group, Inc. ("MDG"), assisted DIA with its sales presentations.

18.     DIA attracted investors by making various misrepresentations about IVDS's likelihood of success.    DIA sales staff also regularly enticed investors by stating that, as soon as IVDS acquired an IVDS license, IVDS would be transformed into a corporation to limit the partners' liability.

19.     The DIA sales personnel and the Solicitation Package sent to potential investors in IVDS, including the Partnership Agreement, did not disclose to the potential investors that DIA, MLG, and MDG would receive sixty percent (60%) of every dollar raised for IVDS.

20.     Ultimately, through the boiler room telemarketing efforts of D. Dambro's entities, approximately 645 persons invested in IVDS. The approximately 645 persons who invested in IVDS were scattered throughout the United States, residing in every state of the United States, other than West Virginia.    Of the approximately 645 IVDS investors, at least 284 investors were 60 years of age or older in 1994.

**C.     The Purchase of the Licenses / Lack of Remaining Capital**

21.     On or about July 28, 1994, IVDS purchased at a Federal Communications

Commission ("FCC") auction three (3) IVDS licenses (the "Licenses") for three (3) separate broadcast areas, for a purchase price of $6,000,000.00.

22.    By the time the Licenses were purchased by IVDS, however, DIA had only raised approximately $1,500,000, representing 25% of the $6,000,000 License purchase price.    After approximately August 1, 1994, DIA raised the remaining approximately $4,500,000 from investors.

23.    D. Dambro caused IVDS to incur a $6,000,000 obligation to the FCC at a time when IVDS only had approximately $600,000 in funds[2] with which to satisfy the obligation to the FCC.    In fact, D. Dambro ultimately left IVDS with only $2,400,000 with which to satisfy all of IVDS's obligations to the FCC, and with a $6,000,000 debt to the FCC.

24.    The $2,400,000 remaining after extraction of the 60% fee was insufficient capital for IVDS to successfully operate, as IVDS could not even meet its FCC debt installment obligations, let alone FCC construction, or IVDS build-out obligations. Although IVDS made the initial $1,200,000 down payment to the FCC for the Licenses, it could not, and did not, make any additional payments on the $6,000,000 obligation to the FCC.

25.    Despite representations to potential investors of how IVDS would operate and make a profit, neither D. Dambro nor any of the entities ever prepared or obtained a business plan or other financial forecasts to evaluate whether $2,400,000

---

[2]        Since DIA, MLG and MDG were going to be paid 60% of IVDS's funds, IVDS would be left with only 40% of the $1,500,000 or $600,000.

would be sufficient to enable IVDS to be a viable business enterprise. In fact, a few days

after the FCC auction, on August 5, 1994, Lee Payne, the consultant to IVDS, set forth a

detailed analysis explaining that IVDS was not in a financial position to exploit the

Licenses.

26.    At all relevant times, in doing the things and not doing the things

complained of herein, D. Dambro was directly and/or indirectly an organizer and

promoter of IVDS.

27.    At all relevant times, in doing the things and not doing the things

complained of herein, D. Dambro did so in furtherance of an ongoing fraudulent scheme

and conspiracy to which D. Dambro and others were parties, specifically and maliciously

formed and intended to damage IVDS as well as IVDS's business and other property

rights for the pecuniary gain of D. Dambro and his co-conspirators.

**D.    IVDS's Tax Return**

28.    On IVDS's tax return for the 1994 fiscal year end, IVDS reported

approximately $3,085,961 of syndication costs. Furthermore, IVDS's accountants, BDO

Seidman ("BDO"), reported "expenses" paid on behalf of IVDS for the year ended 1994,

in the amount of $3,561,729.24.[3]

**E.    Cease and Desist Orders**

---

[3]    Pursuant to BDO's compilation, the following parties received at least the
following amounts through December, 1994:

| | |
|---|---|
| MLG | $ 325,941.91 |
| DIA | $ 882,665.03 |
| MDG | $ 569,319.99 |
| Mallach | $  39,729.89 |
| Total: | $1,817,656.82 |

29.    Regulating agencies of at least 17 U.S. states initiated inquiries into the legality of the marketing and selling IVDS's investment units and took the position that the marketing of the investment units in IVDS violated state securities laws.    IVDS stipulated to cease and desist orders in some of these states.

**F.    The IVDS Bankruptcy Case and Adversary Proceeding**

30.    Ultimately, less than 2 years after formation of IVDS, when IVDS could not meet its obligations, a bankruptcy proceeding (the "IVDS Bankruptcy Case") was commenced on December 1, 1995 (the "IVDS Petition Date"), when IVDS filed a voluntary petition for relief under Chapter 11 of title 11 of the Code.    Pursuant to an Order of the Court entered on April 17, 1996, Plaintiff was appointed as the Chapter 11 Trustee.    The Bankruptcy Proceeding was subsequently converted to a proceeding under Chapter 7 of the Bankruptcy Code by an Order entered November 3, 1997.    Plaintiff was appointed to serve as the Chapter 7 trustee in the Bankruptcy Proceeding on November 12, 1997.

31.    On November 24, 1997, Plaintiff commenced the IVDS Adversary Proceeding in the United States Bankruptcy Court for the Central District of California, San Fernando Division, by the filing of a Complaint against, *inter alia*, D. Dambro, to Avoid Fraudulent Transfers (the "IVDS Adversary Complaint").

32.    During the course of the IVDS Adversary Proceeding, D. Dambro admitted, among other things, that: a) DIA sold interests in IVDS; b) An initial down payment of $1.2 million was paid to the FCC by IVDS and IVDS was then obligated to

pay the FCC an additional $4.8 million in principal and other charges; and c) DIA was a venture capital firm engaged in the raising of capital for IVDS.

33.    On or about October 16, 2000, the reference to the Bankruptcy Court was withdrawn and the IVDS Adversary Proceeding was transferred to the United States District Court for the Central District of California, Los Angeles Division.

34.    After a jury trial, on May 7, 2007, Final Judgment was entered in favor of Plaintiff, and against D. Dambro, among others, in the amount of $5,600,000, consisting of $3,600,000 of actual damages and $2,000,000 in punitive damages.    A copy of the Final Judgment is attached herein as Exhibit "A".

35.    As reflected in the transcript of April 13, 2007, a copy of which is attached hereto as Exhibit "B", the jury in the trial of the IVDS Adversary Proceeding unanimously found that:

    a.    IVDS made transfers to D. Dambro (and others) with the intent to hinder, delay and defraud creditors of IVDS;

    b.    D. Dambro's actions were part of a conspiracy to have IVDS make fraudulent transfers to him or for his benefit;

    c.    In having IVDS make fraudulent transfers to him or for his benefit, D. Dambro acted maliciously;

    d.    In having IVDS make fraudulent transfers to him or for his benefit, D. Dambro acted oppressively;

    e.    In having IVDS make fraudulent transfers to him or for his benefit, D. Dambro acted in reckless disregard of the rights of IVDS.

36.    D. Dambro subsequently appealed the Final Judgment, which was affirmed by the United States Court of Appeals for the Ninth Circuit on December 23, 2008. A copy of the Mandate from the United States Court of Appeals for the Ninth Circuit is attached hereto as Exhibit "C."

### COUNT I – EXCEPTION TO DISCHARGE – 11 U.S.C. § 523(a)(2)(A)

37.    Plaintiff realleges paragraphs 1 through 36 of this Complaint as if fully set forth herein.

38.    The representations by D. Dambro to IVDS investors, either directly or through IVDS and/or DIA, as set forth above, were deliberately false in many respects.

39.    D. Dambro knew or should have known that the marketing materials, representations and partnership solicitation documents for IVDS contained materially false representations that were made for the purpose of misleading potential investors and inducing them to invest in IVDS.

40.    The investors in IVDS believed the representations to be true, and in reasonable reliance thereon, invested monies in IVDS.

41.    The aforementioned representations made by D. Dambro in connection with the solicitation of investors for IVDS were materially false, and the investors and creditors of IVDS were damaged by their justifiable reliance on those representations.

42.    As a result of the foregoing misrepresentations, the investors and creditors of IVDS suffered damages of at least $5,600,000, together with appropriate interest thereon.

43.    Pursuant to §523(a)(2)(A) of the Code, D. Dambro obtained funds from

IVDS and its investors under false pretences, false representations or actual fraud.

44.    Had the investors in IVDS been aware of the fact that DIA, MLG, and MDG would receive sixty percent (60%) of every dollar raised for IVDS, the investors would not have invested their funds in IVDS, and the fraudulent conveyance of IVDS' funds to D. Dambro would not have occurred.

WHEREFORE, Diamond respectfully requests entry of this Court's judgment declaring that the indebtedness owed by D. Dambro to Diamond pursuant to the Final Judgment entered in the IVDS Adversary Proceeding is excepted from any bankruptcy discharge, pursuant to 11 U.S.C. 523(a)(2), and for such other and further relief as this Court deems just and proper.

## COUNT II – EXCEPTION TO DISCHARGE – 11 U.S.C. § 523(a)(4)

45.    Diamond realleges paragraphs 1 through 36 of this Complaint as if fully set forth herein.

46.    During the course of the scheme to defraud the investors of IVDS, and soliciting investors for IVDS, as more particularly set forth above, D. Dambro (either directly or indirectly through one of his shell corporations, DIA, MLG or MDG), acted as a general partner and/or fiduciary for IVDS and its investors.

47.    While acting in a fiduciary capacity for IVDS and its investors, D. Dambro caused IVDS to fraudulently transfer monies from IVDS to or on behalf of himself and others.

48.    In causing IVDS to fraudulently transfer monies from IVDS to or on behalf of himself and others, D. Dambro acted in reckless disregard of the rights of IVDS

.

49.     Accordingly, D. Dambro committed fraud and defalcation, while acting in a fiduciary capacity to IVDS.

WHEREFORE, Plaintiff respectfully requests entry of this Court's judgment declaring that the indebtedness owed by D. Dambro to Diamond pursuant to the Final Judgment entered in the IVDS Adversary Proceeding is excepted from any bankruptcy discharge, pursuant to 11 U.S.C. 523(a)(4), and for such other and further relief as this Court deems just and proper.

## COUNT III – EXCEPTION TO DISCHARGE – 11 U.S.C. § 523(a)(6)

50.     Diamond realleges paragraphs 1 through 36 of this Complaint as if fully set forth herein.

51.     During the course of the scheme to defraud the investors of IVDS, and soliciting investors for IVDS, as more particularly set forth above, D. Dambro (either directly or indirectly through one of his shell corporations, DIA, MLG or MDG), converted monies and property of IVDS to his own use and for his own benefit.

52.     In so doing, D. Dambro caused IVDS to fraudulently transfer monies from IVDS to or on behalf of himself and others.

53.     In causing IVDS to fraudulently transfer monies from IVDS to or on behalf of himself and others, D. Dambro acted willfully, maliciously, oppressively, and in reckless disregard of the rights of IVDS.

54.     In causing IVDS to fraudulently transfer monies from IVDS to or on behalf of himself and others, D. Dambro caused willful and malicious injury to IVDS and

its property.

WHEREFORE, Plaintiff respectfully requests entry of this Court's judgment declaring that the indebtedness owed by D. Dambro to Plaintiff pursuant to the Final Judgment entered in the IVDS Adversary Proceeding is excepted from any bankruptcy discharge, pursuant to 11 U.S.C. 523(a)(6), and for such other and further relief as this Court deems just and proper.

/s/ Jon E. Kane
JON E. KANE
Florida Bar Number 814202
Mateer & Harbert, P.A.
Post Office Box 2854
Orlando, Florida 32802-2854
Telephone: (407) 425-9044
Facsimile: (407) 423-2016
jkane@mateerharbert.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by electronic transmission via the Court's Notice of Electronic Filing to those parties who appear on the CM/ECF Service List and/or via first class U.S. Mail, this 22nd day of May, 2009, to: Lauren P. Greene, Trustee, 13611 Park Boulevard, Suite H, Seminole, Florida 33776; and Christopher D. Smith, Esq., 7313 International Place, Suite 80, Sarasota, FL 34240, Attorney for Debtor; Debtor, David J. Dambro, Debtor, 8455 Miramar Way, Bradenton, FL 34202.

/s/ Jon E. Kane
JON E. KANE, ESQUIRE
Florida Bar Number 814202

ND: 4821-2481-0243, v. 1

13

1  Howard Kollitz [State Bar No. 059611],
   Uzzi O. Raanan [State Bar No. 162747] of
2  DANNING, GILL, DIAMOND & KOLLITZ, LLP
   2029 Century Park East, Third Floor
3  Los Angeles, California 90067-2904
   Telephone: (310) 277-0077
4  Facsimile: (310) 277-5735

5  Attorneys for Plaintiff,
   Richard K. Diamond, as Chapter 7 Trustee
6

7

8            UNITED STATES DISTRICT COURT

9           CENTRAL DISTRICT OF CALIFORNIA

10               LOS ANGELES DIVISION

11

12  In re                                    )  USDC Case No. CV-00-9980-CBM
                                             )
    IVDS Interactive Acquisitions Partners,  )  [Bankruptcy Case No. SV-95-19539-GM]
13  [Fed. I.D. No. 59-32342115]              )
                                             )      [Chapter 7]
14                          Debtor.          )
                                             )  [Bankruptcy Adv. No. AD-97-02050-GM]
15  _____   )
                                             )
16  RICHARD K. DIAMOND, as Chapter 7 Trustee; )
                                             )
17                          Plaintiff,       )         JUDGMENT
                                             )
18          vs.                              )
                                             )   Priority ____
19  DIGITAL INTERACTIVE ASSOCIATES, INC.;    )   Send ____
    MARKET DYNAMICS GROUP, INC.;             )   Enter ____
20  MARKET LOGISTICS GROUP, INC.; TERRY      )   Closed ____
    K. VICKERY; DAVID J. DAMBRO; MICHAEL     )   JS-5/JS-6 ____
21  DAMBRO;                                  )   JS-2/JS-3 ____
                                             )   Scan Only ____
22                          Defendants.      )
                                             )
23  _____   )

24  ///

25  ///

26  ///

27  ///

28  ///

                                -1-

307922.01 [XP]    9519539SVA

1   This matter was duly tried before a jury commencing on April 3, 2007 with The Honorable

2   Consuelo B. Marshall, United States District Judge, presiding; the matter was duly submitted to the

3   jury by means of a special verdict consisting of a series of questions; on April 13, 2007, according

4   to the instructions given to the jury, the jury returned its verdict by way of its answers to the

5   questions propounded to the jury; therefore, in accordance with the verdict so rendered by the

6   jury's responses in this matter and applicable law; it is hereby,

7

8   **ORDERED, ADJUDGED AND DECREED, that:**

9

10         1.      Plaintiff, Richard K. Diamond, as Trustee, recover from the Defendant and

11   co-conspirator, **DAVID J. DAMBRO,** the sum of **$3,600,000,** pursuant to the applicable legal

12   principles of joint and several liability, as actual damages, plus the additional sum of **$2,000,000** as

13   punitive damages from the Defendant David J. Dambro, individually;

14

15         2.      Plaintiff, Richard K. Diamond, as Trustee, recover from the Defendant and

16   co-conspirator, **TERRY K. VICKERY,** the sum of **$3,600,000,** pursuant to the applicable legal

17   principles of joint and several liability, as actual damages, plus the additional sum of **$1,000,000** as

18   punitive damages from the Defendant Terry K. Vickery, individually;

19

20         3.      Plaintiff, Richard K. Diamond, as Trustee, recover from the Defendant and

21   co-conspirator, **MICHAEL DAMBRO,** the sum of **$3,600,000,** pursuant to the applicable legal

22   principles of joint and several liability, as actual damages, plus the additional sum of **$500,000,** as

23   punitive damages from Defendant Michael Dambro, individually;

24

25         4.      Plaintiff, Richard K. Diamond, as Trustee, recover from the Defendant and

26   co-conspirator, **MARKET DYNAMICS GROUP, INC.,** pursuant to the applicable legal

27   principles of joint and several liability, the sum of **$3,600,000,** as actual damages;

28

-2-

307922.01 [XP]      9519539SVA

1          5.     Plaintiff, Richard K. Diamond, as Trustee, recover from the Defendant and

2  co-conspirator, **MARKET LOGISTICS GROUP, INC.**, pursuant to the applicable legal

3  principles of joint and several liability, the sum of **$3,600,000**, as actual damages;

4

5          6.     Plaintiff, Richard K. Diamond, as Trustee, recover from the Defendant and

6  co-conspirator, **DIGITAL INTERACTIVE ASSOCIATES, INC.**, pursuant to the applicable

7  legal principles of joint and several liability, the sum of **$3,600,000**, as actual damages;

8

9          7.     Plaintiff, Richard K. Diamond, as Trustee, shall, according to the applicable

10  legal principles of joint and several liability, recover a total, aggregate amount of actual damages in

11  an amount not to exceed $3,600,000 from any one or more or all of the Defendants and co-

12  conspirators, in addition to the specific amounts hereinbefore awarded as punitive damages

13  individually as against Defendants and co-conspirators, David J. Dambro ($2,000,000), Terry K.

14  Vickery ($1,000,000) and Michael Dambro ($500,000), as well as interest and costs as hereinafter

15  awarded;

16

17          8.     Plaintiff, Richard K. Diamond, as Trustee, is hereby determined to be the

18  prevailing party, and none of the Defendants shall recover anything from the Plaintiff;

19

20          9.     In accordance with 28 U.S.C. § 1961(a), the actual damages awarded by this

21  Judgment to the Plaintiff, Richard K. Diamond, as Trustee, in the total, aggregate amount of

22  $3,600,000 as against all of the Defendants and co-conspirators, shall bear interest at the judgment

23  rate from and after the date of entry of this Judgment, as set forth in the Memorandum attached

24  hereto as Exhibit "A" and, by this reference, fully incorporated herein, until this Judgment is fully

25  paid;

26

27         10.    In accordance with 28 U.S.C. § 1961(a), the $2,000,000 in punitive damages

28  awarded by this Judgment to the Plaintiff, Richard K. Diamond, as Trustee, as against the

-3-

1  Defendant and co-conspirator, David J. Dambro, individually, shall bear interest at the judgment

2  rate from and after the date of entry of this Judgment, as set forth in the Memorandum attached

3  hereto as Exhibit "A" and, by this reference, fully incorporated herein, until this Judgment is fully

4  paid;

5

6      11.    In accordance with 28 U.S.C. § 1961(a), the $1,000,000 in punitive damages

7  awarded by this Judgment to the Plaintiff, Richard K. Diamond, as Trustee, as against the

8  Defendant and co-conspirator, Terry K. Vickery, individually, shall bear interest at the judgment

9  rate from and after the date of entry of this Judgment, as set forth in the Memorandum attached

10 hereto as Exhibit "A" and, by this reference, fully incorporated herein, until this Judgment is fully

11 paid;

12

13     12.    In accordance with 28 U.S.C. § 1961(a), the $500,000 in punitive damages

14 awarded by this Judgment to the Plaintiff, Richard K. Diamond, as Trustee, as against the

15 Defendant and co-conspirator, Michael Dambro, individually, shall bear interest at the judgment

16 rate from and after the date of entry of this Judgment, as set forth in the Memorandum attached

17 hereto as Exhibit "A" and, by this reference, fully incorporated herein, until this Judgment is fully

18 paid; and,

19

20     13.    Plaintiff shall also recover costs of suit from the Defendants and co-

21 conspirators, according to the legal principles of joint and several liability, ~~in the total amount of~~ _pursuant to_

22 _Local Rule 54-3._

23

24

25 Dated: 5/10/07

26                                    _CONSUELO B. MARSHALL_
                                      **CONSUELO B. MARSHALL**
27                                    **United States District Judge**

28

-4-

1

**EXHIBIT "A" TO JUDGMENT**

2           **USDC Case No. CV-00-9980-CBM**

3    **[Third Amended Memorandum Re: Interest Calculation Under**

4        **28 U.S.C. § 1961(a) Pursuant to Local Rule 58-7]**

5

6        1.    As to the **$3,600,000** in actual damages awarded against all Defendants and

7  co-conspirators, on a joint and several basis, interest shall be added to the Judgment in the amount

8  of **$483.29** per day from and after the date of entry of the Judgment based upon the annual rate of

9  **4.90%**, which percentage rate is equal to the weekly average one year constant maturity Treasury

10  yield as published by the Board of Governors of the Federal Reserve System for the calendar week

11  which commenced on **April 30, 2007** ("the Federal Rate").

12

13        2.    As to the **$2,000,000** in punitive damages awarded individually against the

14  Defendant and co-conspirator, David J. Dambro, interest shall be added to the Judgment in the

15  amount of **$268.49** per day from and after the date of entry of the Judgment based upon the Federal

16  Rate.

17

18        3.    As to the **$1,000,000** in punitive damages awarded individually against the

19  Defendant and co-conspirator, Terry K. Vickery, interest shall be added to the Judgment in the

20  amount of **$134.25** per day from and after the date of entry of the Judgment based upon the Federal

21  Rate.

22

23        4.    As to the **$500,000** in punitive damages awarded individually against the

24  Defendant and co-conspirator, Michael Dambro, interest shall be added to the Judgment in the

25  amount of **$67.12** per day from and after the date of entry of the Judgment based upon the Federal

26  Rate.

27                              **EXHIBIT "A"**

28

041307 #2.txt

1

1
2
3
                    UNITED STATES OF AMERICA
                  UNITED STATES DISTRICT COURT
                  CENTRAL DISTRICT OF CALIFORNIA
                        WESTERN DIVISION

4                          - - -
                HONORABLE CONSUELO B. MARSHALL
5          UNITED STATES DISTRICT JUDGE PRESIDING
                          - - -
6

7   RICHARD K. DIAMOND,                    )
8              PLAINTIFF,                   )
                                           )
9   VS.                                     )
                                           )   CASE NO.:
10  DIGITAL INTERACTIVE ASSOCIATES,         )   CV 00-9980-CBM
    ET AL.,                                 )
11             DEFENDANT.                    )
                                           )
12  _____)

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                   FRIDAY, APRIL 13, 2007

17                   LOS ANGELES, CALIFORNIA

18

19

20

21              LAURA MILLER ELIAS, CSR 10019
22            FEDERAL OFFICIAL COURT REPORTER
            312 NORTH SPRING STREET, ROOM 453
23            LOS ANGELES, CALIFORNIA 90012
                 PH:  (213)620-0890
24

25

                  UNITED STATES DISTRICT COURT

                         Page 1

2

EXHIBIT
B

041307 #2.txt

1

APPEARANCES OF COUNSEL:

2

3

ON BEHALF OF PLAINTIFF:

4

5            DANNING, GILL, DIAMOND & KOLLITZ

6            BY: HOWARD KOLLITZ, ESQ.

7            UZZI RAANAN, ESQ.

8            2029 CENTURY PARK EAST

9            THIRD FLOOR

10           LOS ANGELES, CALIFORNIA 90067

11

12   ON BEHALF OF DEFENDANT DAMBRO, ET AL:

13

14           ROBERT T. MCALLISTER, ESQ.

15           455 SHERMAN STREET

16           SUITE 300

17           DENVER, COLORADO 80203

18

19   TERRY VICKERY, DEFENDANT PRO SE

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

0

3

1                        INDEX

Page 2

2

041307 #2.txt

2

3    PROCEEDINGS                                      PAGE

4    VERDICT PHASE ONE                                4

5

6    PUNITIVE DAMAGES TRIAL

7

8    DAVID J. DAMBRO

9    DIRECT EXAMINATION                               16

10    CROSS-EXAMINATION                               22

11    REDIRECT EXAMINATION                            23

12

13    TERRY VICKERY

14    DIRECT EXAMINATION                              24

15

16    CLOSING ARGUMENTS

17    BY:  MR. RAANAN                                 36

18    BY:  MR. McALLISTER                             38

19    BY:  MR. VICKERY                                41

20

21    JURY INSTRUCTIONS                               42

22

23    VERDICT PHASE TWO                               44

24

25

UNITED STATES DISTRICT COURT

4

1    LOS ANGELES, CALIFORNIA; FRIDAY, APRIL 13, 2007; 2:15 P.M.

2                          - - -

3              THE COURT:  Back on the record.  The record should

Page 3

041307 #2.txt

4  reflect that we have our jurors in the box.  And could I have

5  the name of the jury spokesperson, please?

6  JUROR CORTEZ:  Willie Cortez.

7  THE COURT:  And it's my understanding that the jury

8  has reached a unanimous verdict?

9  JUROR CORTEZ:  Yes, ma'am.

10  THE COURT:  If you'll give the verdict form to the

11  clerk, I will review it.  If I could see counsel at side bar,

12  please.  We don't need the reporter.

13  (Side bar conference.)

14  THE COURT:  The Court is giving the verdict to the

15  clerk so that the clerk may read the verdict.

16  THE CLERK:  Richard Diamond versus Digital

17  Interactive Associates, et al.  Jury verdict.

18  First cause of action that debtor made a transfer

19  or incurred an obligation with the actual intent to hinder,

20  delay or defraud any creditor of the debtor.

21  No. 1.  Do you the jury in the above-entitled

22  action unanimously find in favor of the Plaintiff Richard K.

23  Diamond as Chapter 7 trustee for the bankruptcy estate of

24  IAAP Interactive Acquisition Partners and against defendants?

25  1.  David J. Dambro:  Yes.


UNITED STATES DISTRICT COURT

5

1  2.  Market Dynamics:  Yes.

2  3.  Terry Vickery:  Yes.

3  4.  Digital Interactive Associates:  Yes.

4  5.  Michael Dambro:  Yes.

5  6.  Market Logistics Group, Incorporated:  Yes.

Page 4

041307 #2.txt

6      No. 2.  We the jury unanimously find that the

7    defendants' actions in this case were part of a conspiracy to

8    have the debtor make fraudulent transfers to them or for

9    their benefit.

10          1.  David Dambro:  Yes.

11          2.  Market Dynamics Corporation:  Yes.

12          3.  Terry Vickery:  Yes.

13          4.  Digital Interactive Associates:  Yes.

14          5.  Mike Dambro:  Yes.

15          6.  Market Logistics Group:  Yes.

16          No. 3.  We the jury unanimously assess plaintiff's

17    actual or compensatory damages against the defendants in the

18    sum of:

19          1.  David J Dambro:  $680,000.

20          2.  Market Dynamics Corporation:  $40,000.

21          3.  Terry Vickery:  $400,000.

22          4.  Digital Interactive Associates:  $32,000.

23          5.  Michael Dambro:  $260,000.

24          6.  Market Logistics Group:  $28,000.

25          Second cause of action.  That debtor made a

UNITED STATES DISTRICT COURT

6

1    transfer or incurred an obligation one, without receiving an

2    equivalent value in exchange for the transfer or obligation

3    and two, was engaged or was about to engage in a business or

4    transaction for which the remaining assets of the debtor were

5    unreasonably small in relation to the business or

6    transaction.

7          No. 1.  Do you the jury in the above-entitled

Page 5

041307 #2.txt

8    action unanimously find in favor of Plaintiff Richard K.

9    Diamond as Chapter 7 trustee for the bankruptcy estate of

10   IAAP Interactive Acquisition Partners and against defendants?

11             1.  David Dambro:  Yes.

12             2.  Market Dynamics Group:  Yes.

13             3.  Terry Vickery:  Yes.

14             4.  Digital Interactive Associates:  Yes.

15             5.  Michael Dambro:  Yes.

16             6.  Market Logistics Group:  Yes.

17             No. 2.  We the jury unanimously find that the

18   defendants' actions within this case were part of a

19   conspiracy by the defendants to have the debtor make

20   fraudulent transfers to them or for their benefit.

21             1.  David Dambro:  Yes.

22             2.  Market Dynamics Group:  Yes.

23             3.  Terry Vickery:  Yes.

24             4.  Digital Interactive Associates:  Yes.

25             5.  Michael Dambro:  Yes.


                    UNITED STATES DISTRICT COURT


                                                            7


1             6.  Market Logistics Group:  Yes.

2             No. 3.  We the jury unanimously assess plaintiff's

3    actual or compensatory damages against defendants in the sum

4    of:

5             1.  David Dambro:  $510,000.

6             2.  Market Dynamics Group:  $30,000.

7             3.  Terry Vickery:  $300,000.

8             4.  Digital Interactive Associates:  $24,000.

9             5.  Michael Dambro:  $195,000.

                        Page 6

041307 #2.txt

10       6.  Market Logistics Group:  $21,000.

11           Third cause of action.  That debtor made a transfer

12       or incurred an obligation one, without receiving an

13       equivalent value in exchange for the transfer or obligation

14       and two, intended to incur or believed or reasonably should

15       have believed that he or she would have incurred debts beyond

16       his or ability to pay as they became due.

17           1.  We the jury in the above-entitled action

18       unanimous find in favor of Plaintiff Richard K. Diamond as

19       the Chapter 7 trustee for the bankruptcy estate of IAAP

20       Interactive Acquisitions Partners and against defendants:

21           1.  David Dambro:  Yes.

22           2.  Market Dynamics Group:  Yes.

23           3.  Terry Vickery:  Yes.

24           4.  Digital Interactive Associates:  Yes.

25           5.  Michael Dambro:  Yes.


UNITED STATES DISTRICT COURT


8


1            6.  Market Logistics Group:  Yes.

2            No. 2.  We the jury unanimously find that

3        defendants' action were part of a conspiracy by the

4        defendants to have the debtor make fraudulent transfers to

5        them and for their benefit.

6            1.  David Dambro:  Yes.

7            2.  Market Dynamics Group:  Yes.

8            3.  Terry Vickery:  Yes.

9            4.  Digital Interactive Associates:  Yes.

10           5.  Michael Dambro:  Yes.

11           6.  Market Logistics Group:  Yes.

Page 7

041307 #2.txt

12      No. 3.  We the jury unanimously assess the
13  plaintiff's actual or compensatory damages against the
14  defendants in sum of:

15          1.  David Dambro:  $510,000.
16          2.  Market Dynamics Group:  $30,000.
17          3.  Terry Vickery:  $300,000.
18          4.  Digital Interactive Associates:  24,000.
19          5.  Michael Dambro:  $195,000.
20      And 6.  Market Logistics Group:  $21,000.
21      No. 4.  We the jury unanimously find that
22  defendants acted (A) maliciously:
23          1.  David Dambro:  Yes.
24          2.  Market Dynamics Group:  Yes.
25          3.  Terry Vickery:  Yes.

UNITED STATES DISTRICT COURT

9

1           4.  Digital Interactive Associates:  Yes.
2           5.  Michael Dambro:  Yes.
3           6.  Market Logistics Group:  Yes.
4       Acted (B) oppressively.
5           1.  David Dambro:  Yes.
6           2.  Market Dynamics Group:  Yes.
7           3.  Terry Vickery:  Yes.
8           4.  Digital Interactive Associates:  Yes.
9           5.  Michael Dambro:  Yes.
10          6.  Market Logistics Group:  Yes.
11      (C) acted in reckless disregard of the plaintiff's
12  rights.
13          1.  David Dambro:  Yes.

Page 8

041307 #2.txt

14      2.  Market Dynamics Group:  Yes.

15      3.  Terry Vickery:  Yes.

16      4.  Digital Interactive Associates:  Yes.

17      5.  Michael Dambro:  Yes.

18      6.  Market Logistics Group:  Yes.

19          Dated April 13, 2007 and signed by the foreperson

20  Willie Cortez.  Ladies and gentlemen of the jury, is this

21  your verdict as presented so say each of you so say you all?

22          THE JURY:  Yes.

23          THE COURT:  Would you like to have jury polled.

24          ATTY2:  No, Your Honor.

25          THE COURT:  At this point if I can see counsel at

UNITED STATES DISTRICT COURT

10

1   side bar again and we don't need the reporter.

2          (Side bar discussion.)

3          THE COURT:  There could be a second phase to the

4   trial based upon the jurors responses to the questions that

5   were asked.  Whether or not the defendants acted maliciously

6   oppressively and with reckless disregard.  So what that means

7   is the plaintiffs could ask you to award punitive damages.

8   In order for us to make a decision on that, there is some

9   additional information that the plaintiffs need to review.  I

10  don't think it will take very long.  I will find out from

11  them what additional testimony needs to be offered or that

12  they wish to offer.

13          If there is going to be additional testimony, we

14  may or may not have time to do that today.  If we do, we'll

15  do it today and we'll let you deliberate on that issue of

Page 9

041307 #2.txt

16    punitive damages where you will be asked to determine the

17    amount of punitives. And if we can accomplish that today,

18    we'll try. And if we can't, we'll advise you and then the

19    Court will tell you when you need to next return.

20           We'll excuse the jury for about 15 minutes. You

21    can take a break now if you want to do that. The bailiff

22    will assist you in that regard. We should have some

23    information for you pretty quick.

24           (Jury not present.)

25           I think Mr. Levario has the financial information

UNITED STATES DISTRICT COURT

11

1    that was provided so he will unseal that information and

2    provide it to the plaintiffs.

3           Mr. Vickery, do you have the information as to your

4    client -- I mean the information as to yourself and your

5    entity? Do you have a copy for yourself?

6

7           MR. VICKERY: No.

8           THE COURT: And Mr. McAllister, do you have that

9    information for your clients?

10          MR. MCALLISTER: I do.

11          THE COURT: Okay. Well, Mr. Levario will provide

12    it then to those who don't have it, and then the plaintiffs

13    will decide whether you want to ask the jury to return

14    punitives. You certainly indicated that you would.

15    Considering the amount of compensatory damages that they have

16    awarded, I don't know if your position is the same or not,

17    but I'll let you review what Mr. Levario will give you.

Page 10

041307 #2.txt

18    Often in the cases the only additional evidence
19    that's offered is the evidence re the net worth, that
20    financial information that you have.  That can be done by way
21    of stipulation or witnesses could actually be called.  And
22    then as I said, I would give each side an opportunity just to
23    make additional argument to the jury just based on that
24    evidence if you wish to.
25        The arguments shouldn't exceed 10 or 15 minutes.

UNITED STATES DISTRICT COURT

12

1    And then I would read to the jury the punitive damage
2    instruction.  Give them a verdict form.  They would
3    deliberate, and then indicate the amount and that then would
4    end the proceeding.
5        MR. KOLLITZ:  I note, Your Honor, that defendant
6    Michael Dambro is not present in the courtroom.  I think the
7    Court's prior order was that he was to be present but --
8        THE COURT:  Well, the thing is that, you know, he
9    doesn't have to be present.  So if counsel didn't subpoena
10   him, and he's not here, then I would think take information
11   that's provided if you're seeking punitive damages against
12   him.  I guess what you were saying you wouldn't have the
13   opportunity to question him.
14       MR. KOLLITZ:  Correct.  In terms of the subpoena,
15   he was ordered by the court to appear.
16       THE COURT:  All right.
17       MR. KOLLITZ:  Thank you.
18       THE COURT:  Those are all the issues that you need
19   to decide.  How you wish to proceed now.  I'll let you make

041307 #2.txt

20    that decision and we'll take a 15-minute break.

21          (Recess taken.)

22          THE COURT:  All right.  We can go back on the

23    record.  Everyone is present who should be here counsel,

24    plaintiff and defendants.  Do plaintiffs want to ask the jury

25    to award punitive damages?


UNITED STATES DISTRICT COURT


13


1          MR. RAANAN:  Yes, Your Honor.

2          THE COURT:  What kind of evidence would you want to

3    present and about how long do you think that would take?

4          MR. RAANAN:  Your Honor, we would like to make it

5    as short as possible.  Like to simply call Mr. Vickery and

6    Mr. Dambro on the stand.  Take about 10 minutes each, perhaps

7    less.  If need be show them some documents which we have.

8    Really get it done as quickly as possible.

9          THE COURT:  All right.  Mr. McAllister, it sounds

10    like the plaintiffs believe it would take about 10 minutes

11    for their direct examination.  What's your position as far as

12    cross-examination?

13          MR. MCALLISTER:  I don't think there will be any,

14    Your Honor.

15          THE COURT:  Okay.  And do you think that you would

16    offer any direct as far as the defendants are concerned?

17          MR. MCALLISTER:  I have no idea what the evidence

18    is going to be, Judge, but the answer is I will be extremely

19    brief.

20          THE COURT:  Mr. Vickery, would you have any

21    questions other than the questions that are going to be asked

Page 12

12

041307 #2.txt

22    by the plaintiffs?

23        MR. VICKERY:  No.

24        THE COURT:  And you wouldn't call any witnesses?

25        MR. VICKERY:  No.


UNITED STATES DISTRICT COURT

14

1        THE COURT:  So it sounds like it could take as much

2    as 30 minutes and then argument.  For the plaintiffs how much

3    time do you request?

4        MR. RAANAN:  I'll say 10 minutes.  I'll try to do

5    it in 5.

6        THE COURT:  Mr. McAllister?

7        MR. MCALLISTER:  I don't know that I'll make any

8    argument, Your Honor.

9        THE COURT:  And Mr. Vickery?

10       MR. VICKERY:  None.

11       THE COURT:  So I'm going to ask Mr. Leave to tell

12    the jury that it will take 30 to 40 minutes to present the

13    evidence and the arguments.  And inquire of them if they wish

14    to stay and do this today or if they would prefer returning

15    on Monday.  And Mr. Levario and I have talked.  We could

16    actually do it on Monday.  I would just order them for 8:00.

17    We would be finished probably 8:30 or so and it wouldn't

18    interfere with the balance of the Court's calendar.

19       But let me inquire of you if you are able to do it

20    on Monday.  I mean had we not finished the case earlier, you

21    would have been here Monday anyway, but you may have thought

22    we weren't going to have the Monday session.

23       MR. RAANAN:  I would say we are absolutely

Page 13

041307 #2.txt

24    available Monday, but we also realize the jury wants to

25    finish today.  We will work the rest of the evening if we

UNITED STATES DISTRICT COURT

15

1    have to do so to make sure they don't have to come back

2    Monday, but we are available.

3            THE COURT:  And Mr. McAllister?

4            MR. MCALLISTER:  Like to finish today.

5            THE COURT:  But if we needed to come back Monday

6    you could?  You would if ordered back.  I'll put it that way.

7    How about that?

8            MR. MCALLISTER:  I would obviously follow the

9    Court's order or take some other action.

10            THE COURT:  That sounds interesting.

11            And Mr. Vickery, I don't think you have any choice.

12    You would have to be here.

13            MR. VICKERY:  Okay.

14            THE COURT:  I'll let Mr. Levario ask the jury what

15    their preference is to stay and do it court's available but

16    if they had plans and can't stay any longer today, then I

17    would order them back on Monday 8:00 o'clock.  So ask him to

18    communicate that to them and we'll just be in recess until we

19    have some information from the panel.  Hopefully get it fast

20    don't wander far away.

21            THE COURT:  We have the jury in the box and the

22    others are present.  Does the plaintiff wish to make an

23    opening statement?  I assume not at this point.

24            MR. RAANAN:  No, Your Honor.

25            THE COURT:  And as well as the defense, no opening

Page 14

041307 #2.txt

UNITED STATES DISTRICT COURT

16

1    statement?

2              MR. MCALLISTER:  That is correct.

3              MR. VICKERY:  No.

4              THE COURT:  Then you may call your first witness

5    and this is for the punitive damage phase of the trial.

6              MR. RAANAN:  Thank you, Your Honor.  The plaintiff

7    calls defendant Dan Dambro.

8              THE COURT:  All right.  Mr. Dambro, if you'll come

9    forward, please.

10             THE CLERK:  Please be seated.  You are reminded

11   that you are still under oath.  Please state your name again

12   for the record.

13             THE WITNESS:  David Dambro.

14             THE COURT:  All right.  You may proceed.

15             MR. RAANAN:  Thank you, Your Honor.

16                       DIRECT EXAMINATION

17   BY MR. RAANAN:

18   Q.   Good afternoon, Mr. Dambro.

19   A.   Good afternoon.

20   Q.   Mr. Dambro, you were divorced about 5 years ago; is that

21   correct?

22   A.   The beginning of filing was 2001.

23   Q.   About 6 years ago.  And at the time you were divorced,

24   there was an issue in your divorce about the distribution or

25   splitting of assets; correct?

UNITED STATES DISTRICT COURT

Page 15

041307 #2.txt

17

1    A.    Yes.

2    Q.    And the court -- and this is in Florida; correct?

3    A.    Yes.

4    Q.    The court in Florida asked both yourself and your former

5    wife to present evidence about your assets; is that correct?

6    A.    Yes.

7    Q.    And you presented evidence about your assets; correct?

8    A.    They were all joint.  I presented -- yes is the answer.

9    Q.    You gave the Court information about your assets;

10   correct?

11   A.    Yes.

12   Q.    And your former wife gave information about what she

13   thought the assets were?

14   A.    Yes.

15   Q.    There were other witnesses that testified; is that

16   correct?

17   A.    Yes.

18   Q.    As a matter of fact, Mr. Terry Vickery testified; is

19   that correct?

20   A.    That's correct.

21   Q.    Based on that testimony, the court in Florida made

22   factual findings about your assets; correct?

23   A.    Yes, they did.

24   Q.    Meaning the court came out with a report of what the

25   court concluded based on all the evidence that your assets

UNITED STATES DISTRICT COURT

18

Page 16

041307 #2.txt

1    and your former's wife's assets together were; correct?

2    A.    Yes.

3    Q.    And can you tell the court the total value of the assets

4    that the court in Florida found you and your former wife to

5    have in 2001?

6    A.    I can't tell you exactly in 2001 because it went on for

7    so long that by 2003 it was a completely different picture.

8    2004 it was another one.  Actual conclusion of the last trial

9    date was 2005 late in the summer I believe.  I'm sorry.  2006

10   in May.  And so the very first one I believe we had including

11   our house, our marital house 3 million.

12   Q.    And by the time your divorce case was completed, how

13   much money did the court award to your former wife?

14   A.    Well, they awarded -- I'm not sure to tell you the

15   truth.  The house and most of the money.  And after some

16   period of time, I just gave her everything that she asked for

17   and ended up with zero.

18   Q.    Isn't it true that the court split the assets and you

19   got over a million dollars worth of assets?

20   A.    The truth -- the number 1 question it's true the court

21   ordered the assets split.  The truth is it was mostly pieces

22   of real estate and there was an argument for years about

23   selling or dividing them until the point came where I just

24   said I've had enough, take them.  I was left with one piece

25   of property which I paid her $45,000 more for to take

UNITED STATES DISTRICT COURT

19

1    possession of.  That's it.

2    Q.    So even though the court awarded you more than a million

Page 17

041307 #2.txt

3    dollars you're saying you gave it all up?

4    A.    I couldn't collect it.

5    Q.    Is it also true that at that proceeding the court

6    inquired into you're offshore trust accounts?

7    A.    Yes, they did.

8    Q.    Isn't it true that the court concluded that you had been

9    less than forthright in telling the court how much money you

10    were hiding in the foreign trust accounts?

11    A.    I object to using the word hiding.  It was Susan's

12    account and the girls.  And it was broken subsequently

13    because I was just frustrated that she wanted to argue.  So

14    the bank wrote a check out and closed the account.  That's

15    the end of the assets that I ever had for savings for them.

16    Q.    Isn't it true that the court in Florida found that you

17    were less than forthcoming about the assets you had in

18    foreign trust accounts?

19         MR. MCALLISTER:  Objection, Your Honor.  It's

20    argumentative.  It's been answered.

21         THE COURT:  Sustained.

22    BY MR. RAANAN:

23    Q.    Mr. Dambro, do you own a house currently?

24    A.    No.

25    Q.    Do you work?

UNITED STATES DISTRICT COURT

20

1    A.    Yes.

2    Q.    What do you do?

3    A.    I coordinate small investments in real estate between a

4    very -- between four people.

Page 18

18

041307 #2.txt

5  Q.   And what does that entail?

6  A.   Buying and selling lots and building homes.

7  Q.   Real estate lots?

8  A.   Yes.

9  Q.   I'm going to read some names of companies and I want you

10 to say yes or no whether you owned these companies.  Okay?

11 I'll just read them one after the other.  MSB Consulting

12 Corporation?

13 A.   No.

14 Q.   Investor Media Data Distribution Incorporated?

15 A.   Former owner.

16 Q.   Sunica Investment S-u-n-i-c-a?

17 A.   Formally owned.

18 Q.   Dambrecine Incorporated?

19 A.   No.

20 Q.   Investor Media Data -- I take it back.  Financial Equity

21 Holdings LLC?

22 A.   No.

23 Q.   DR Investments LLC?

24 A.   Yes.

25 Q.   Market Dynamics Group?

UNITED STATES DISTRICT COURT

21

1  A.   Yes.

2  Q.   Redline Acquisitions LLC?

3  A.   Part owner.

4  Q.   I'm sorry?

5  A.   Part.

6  Q.   Part owner?  Who else is an owner in that?
Page 19

19

041307 #2.txt

7    A.    The other shareholder.

8    Q.    There is one another?

9    A.    Yes.

10   Q.    And how many of the shares does the other shareholder

11   on?

12   A.    Excuse me. He is a member. He owns an interest of

13   51 percent.

14   Q.    So you own 49 percent?

15   A.    Yes.

16   Q.    Who is the other member?

17   A.    I don't think it's relevant.

18   Q.    Is it a family member?

19   A.    I'm not going to answer you. No.

20   Q.    No, it's not a family member?

21   A.    No.

22   Q.    I just want to make sure --

23   A.    It's a hard working guy who invested money.

24   Q.    But it's not a family member?

25   A.    No.


UNITED STATES DISTRICT COURT


22


1              MR. RAANAN:  Your Honor, that's all I have.

2              THE COURT:  All right.  Cross-examination.

3                      CROSS-EXAMINATION

4    BY MR. MCALLISTER:

5    Q.    Mr. Dambro, before the trial began, did you file with

6    the court a financial statement?

7    A.    Yes, I did.

8    Q.    And pursuant to the financial statement that you

Page 20

041307 #2.txt

9    prepared, did you have what's called a positive or negative

10   net worth?

11   A.   It's currently negative.

12   Q.   Okay.  And what do you mean by a negative net worth?

13   A.   It means I owe more money than I have in assets.

14   Q.   All right.  That's been provided to this side.  They

15   know that?

16   A.   I think they're looking at it and they have been.

17   Q.   All right.  If someone was today attempting to collect

18   from you what the jury awarded 1.7 million, could they find

19   that money anywhere?  Does it exist?

20   A.   No.  I'm in the hole because of the real estate market.

21   We're in extremely deep and I'm just getting in the hole more

22   and more every day.

23            MR. MCALLISTER:  That's all I have.

24            THE COURT:  Do you have any questions, Mr. Vickery?

25            MR. VICKERY:  No.


                UNITED STATES DISTRICT COURT


                                                    23


1             THE COURT:  Redirect.

2                      REDIRECT EXAMINATION

3    BY MR. RAANAN:

4    Q.   Mr. Dambro, I only have one apparently.  It's a copy --

5    I think it's the original of Dave Dambro financial statement

6    dated March 30, 2007.  I would like to hand it to the clerk

7    and have him show it to you.  I believe it's unsigned and not

8    under oath, but I want to make sure that you identify this.

9    And if you do, I would like to enter it into evidence as

10   Exhibit 96.

                    Page 21

041307 #2.txt

11          MR. MCALLISTER:  No objection.

12          THE COURT:  No objection to it being received?

13          MR. MCALLISTER:  No objection, Your Honor.

14          THE COURT:  Since there is no objection to it being

15    received, does counsel still want it to be before the

16    witness?  It can simply be received into evidence without

17    anything further, but if you wanted to question him about it,

18    the clerk will place it before him.

19          MR. RAANAN:  No, Your Honor.

20          THE COURT:  Okay.  It's marked as Exhibit 96 and

21    it's received into evidence.

22          (Exhibit 96 admitted.)

23          THE COURT:  The witness may step down.  Before he

24    does, I'm sorry, Mr. Vickery, did you wish to ask him

25    questions.


                    UNITED STATES DISTRICT COURT


                                                            24


1           MR. VICKERY:  No, ma'am.

2           THE COURT:  You may step down.  All right.  Next

3     witness.

4           MR. RAANAN:  Thank you, Your Honor.  Plaintiff

5     calls Mr. Vickery.

6           THE CLERK:  Please state your name again for the

7     record.

8           THE WITNESS:  Terry Vickery.

9           THE COURT:  You may proceed.

10                          DIRECT EXAMINATION

11    BY MR. RAANAN:

12    Q.  Mr. Vickery, good afternoon.
                          Page 22

041307 #2.txt

13   A.   Afternoon.

14   Q.   I have a personal financial statement that was given to

15   me, I believe it's the only version.  I think it's the

16   original?

17   A.   Yes, sir.

18   Q.   Have you seen it?

19   A.   Yeah.

20   Q.   And have you signed it?

21   A.   Yes, sir.

22   Q.   And there is some information added to it I believe

23   today?

24   A.   Yes.

25   Q.   In pen it was written?

UNITED STATES DISTRICT COURT

25

1    A.   Yes.

2    Q.   And the rest of it is typed up?

3    A.   Yes.

4    Q.   Have you seen the handwriting?

5    A.   Yeah, that's mine.

6    Q.   So you add information in there?

7    A.   Yes, sir.

8    Q.   Basically an oversight?

9    A.   My secretary produced it and I realized it wasn't on

10   there so I put it on there.

11        MR. RAANAN:  Your Honor, like to have this marked

12   Exhibit 97 and have it admitted.

13        THE COURT:  It's received.

14        MR. MCALLISTER:  I have never seen it.
                    Page 23

041307 #2.txt

15          THE COURT:  You haven't seen it and if it's
16   received, it would be as to Mr. Vickery only.  And the Court
17   would so instruct the jury.
18          MR. RAANAN:  only applies to Mr. Vickery.
19          THE COURT:  Yes.  No objection?
20          MR. MCALLISTER:  Well, Your Honor, if it only
21   applies to him, I don't think I have any basis to object.
22          THE COURT:  All right.  It's received.
23          (Exhibit 97 admitted.)
24   BY MR. RAANAN:
25   Q.   Mr. Vickery, do you own your own home?


                 UNITED STATES DISTRICT COURT

                                                        26


1    A.   Yes.
2    Q.   And can you tell me what is the address of your home?
3          THE COURT:  well, he doesn't need to give the
4    address actually.  Do you just want the community?
5          MR. RAANAN:  Actually I want to confirm that I have
6    right information so I can ask the next request question.
7          THE COURT:  Is the address on the document?
8    BY MR. RAANAN:
9    Q.   Mr. Vickery, is it located at 16175 Sand Stone Drive in
10   Morrison, Colorado?
11   A.   Yes, sir.
12   Q.   And Mr. Vickery, I know in the past I asked you this
13   question and at some point you stated that --
14          THE COURT:  Counsel, just ask the question.
15   BY MR. RAANAN:
16   Q.   The house is under your wife's name?
                        Page 24

041307 #2.txt

17    A.    Actually, the deed is in both of our names and the note

18    is in her name since she has better credit so I got a better

19    rate.

20    Q.    Isn't it true that at least as of I would say April 7th

21    of 2007, the house was actually under a trust called T and T

22    trust?

23    A.    No.  It's been out of the trust for 4 or 5 years, but

24    the title companies are very slow in having the title

25    changed.  The last three times I refinanced it have all been

UNITED STATES DISTRICT COURT

27

1    in my wife's name.  Five, six years I would say.

2    Q.    You and your wife own the property together; correct?

3    A.    Yes.

4    Q.    Do you know what the value of the house is?

5    A.    Approximately $900,000.

6    Q.    Mr. Vickery, do you also own any other real estate

7    besides your home?

8    A.    Yes.  I helped a friend buy a house and co-signed for

9    him on 981 Petras Street.  It's on page 2 of 3.

10    Q.    Okay.

11    A.    And I own an office condo where my office is.  I have a

12    bank loan on both of those, but yes, I own both those real

13    estates and I own a duplex that I'm building with two of my

14    friends.

15    Q.    And where it says you added this information on Welch

16    Street, can you tell me the number which I can't quite read?

17    A.    820 Welch Street.

18    Q.    I won't ask any questions because I think this document

Page 25

041307 #2.txt

19    covers that.  In addition to the properties that you

20    identified in your financial statements, do you own a

21    property on Tennenson Street in Denver, Colorado?

22    A.   No.

23    Q.   Elizabeth Street Denver, Colorado?

24    A.   No.

25    Q.   28th Avenue Denver, Colorado?


UNITED STATES DISTRICT COURT

28

1    A.   No.

2    Q.   Umatilla Street Denver, Colorado?

3    A.   No.

4    Q.   3270 to 3290 West Fairview Place in Denver, Colorado?

5    A.   No.

6    Q.   What about 2106 East 17th Avenue in Denver, Colorado?

7    A.   No.

8    Q.   What about 1310 Leyden Street in Denver, Colorado?

9    A.   No.

10   Q.   What about 810 to 846 Forrest Street in Denver,

11   Colorado?

12   A.   No.

13   Q.   Do you recognize any of these addresses?

14   A.   I recognize all of them.

15   Q.   At some point did you own all these properties?

16   A.   I had multiple partners in those properties.  We were

17   doing condo conversions in Denver.  And when the market went

18   upside down, we either signed them over to the bank or sold

19   out of them.  And so now I'm obviously trying to stay out of

20   the condo conversion market so we don't have those properties

Page 26

041307 #2.txt

21    any longer.

22    Q.    So at some point you owned these properties?

23    A.    Yes, sir.  Well, I didn't own, but I owned a percentage

24    out of a group.

25    Q.    Do you own any businesses, Mr. Vickery?

UNITED STATES DISTRICT COURT

29

1    A.    Yes.

2    Q.    And TKV Consulting is one of them?

3    A.    Yes, sir.

4    Q.    Do you also own a company called Platte River Village

5    Development Incorporated?

6    A.    Yeah, I just had it set up recently to get into

7    development.

8    Q.    Okay.  Do you own a company called 3051 to 3063 Zuni

9    Street LLC?

10    A.    No, but we set that one up for one of my clients.

11    Q.    It's not your company?

12    A.    No.

13    Q.    Are you the registered agent for that company?

14    A.    I don't think I am.  I may be.  I set it up for one of

15    my financiers, builders.

16    Q.    I'm sorry?

17    A.    I thought I set it up for one of my investing partners,

18    someone who is a builder.

19    Q.    So you put it in someone else's name?

20    A.    No, I may have registered for him.  It's pretty easy to

21    do online.

22    Q.    Are you an attorney, Mr. Vickery?

Page 27

041307 #2.txt

23   A.   No.

24        MR. MCALLISTER:  I'm going to object, Judge.  We

25   know he's not an attorney.  It's a waste of everyone's time.


UNITED STATES DISTRICT COURT

30

1         THE COURT:  Overruled.

2         THE WITNESS:  You can register LLCs pretty easily.

3   BY MR. RAANAN:

4    Q.   So you were registering an LLC on behalf of a friend?

5    A.   And I'm trying to get financing for him as well.

6    Q.   Do you have any ownership interest in this LLC?

7    A.   I don't believe so.

8    Q.   Any kind of interest in the LLC?

9    A.   Well, if I can get the financing, I'll have an interest

10   in it.

11   Q.   What kind of interest?

12   A.   We haven't negotiated the exact percentage yet.

13   Q.   What's customary in the industry?

14   A.   As much as you can get.

15   Q.   What do you usually get?

16   A.   Between 10 and 20 percent, sometimes a third.

17   Q.   Of what?  What's going to be the financing on this?

18   A.   Well, if we can get the -- we're trying to convert an

19   8-plex to a 4-plex, downtown Denver, but we haven't been able

20   to get the plans approved.  So right now it just has a lot of

21   debt.  If we get financing and construction money, then we

22   will get financing.  If I can't, we'll just sell the property

23   for what it was purchased for.

24   Q.   And how much money would you need to finance this
                          Page 28

041307 #2.txt

25    project?


UNITED STATES DISTRICT COURT

31

1    A.    Well, the debt on it $550,000 and we think we need a
2    million two to 600,000 to do the construction, tear down the
3    old construction and build the new one.
4    Q.    So if you got your percentage, it would be something
5    like 15 to 20 percent --
6    A.    As much as a third depending on if we have five or four
7    or three partners participating.
8    Q.    Have you also heard of a company called 7003 West 29th
9    Avenue LLC?
10    A.    Yeah, that's an LLC.
11    Q.    Is that your company?
12    A.    It's not my company.  It's the same LLC with the 820
13    Welch Street.  Might have that one.  The same guys are doing
14    it.  We haven't finalized the project on that yet.
15    Q.    This goes to 820 Welch which is in your form which is
16    going to go to the jury?
17          THE COURT:  Wait a moment.
18    Q.    I just want to make sure I understand.  The 7003 West
19    29th Street LLC is the company you're using with regard to
20    the project that involves the 820 Welch Street property?
21    A.    Yeah, and they're looking at another property as well.
22    Q.    Okay.  Is there any reason you called 7003 West 29th
23    Avenue when the property is on Welch Street?
24    A.    I think there was a property we had tied up on that
25    address.

Page 29

041307 #2.txt

UNITED STATES DISTRICT COURT

32

1   Q.   What happened to that property that you tied up?

2   A.   We're still negotiating financing terms.

3   Q.   How did you tie it up?  What does that mean?

4   A.   One of my clients put the earnest money down for the

5   property.

6   Q.   So they have a right to purchase at this point?

7   A.   Yes.

8   Q.   And if the property is purchased, what would be your

9   interest in it?

10   A.   I think we're going to have four partners so probably

11   25 percent.

12   Q.   And what would be the value of that asset?

13   A.   Oh, right now it's only worth $125,000 and so we would

14   have to finance.  We might be able to make it into a profit

15   of probably $75,000.

16   Q.   In May of 2002, you indicated that you had interests in

17   real estate located at Elizabeth Street?

18   A.   Yes.

19   Q.   It was equity in a duplex?

20   A.   Actually, we ended up losing money on that particular

21   duplex.

22   Q.   What happened to that duplex?

23   A.   My contractors took forever to finish it.  So by the

24   time we finished it, we just didn't make a profit.

25   Q.   So you sold it?

UNITED STATES DISTRICT COURT

Page 30

041307 #2.txt

33

```
1    A.    Yeah.

2    Q.    You also indicated that you had Ingalls Street, it's a

3    five condo unit?

4    A.    Yeah, that whole list every property has been sold.

5    Q.    Same with Castle Rock 6 condo unit equity?

6    A.    Yes.

7    Q.    It's been sold.  Mr. Vickery, I understand that you

8    testified in Mr. Dambro's divorce proceeding; is that

9    correct?

10   A.    Yes.

11   Q.    And was that with regard to assets or property of

12   Mr. Dambro?

13   A.    I don't recall it being about assets.  I just thought I

14   had to testify on the fact they were married and we were

15   partners, but I may have.

16   Q.    As we sit today obviously under oath, do you remember

17   what you testified about with regard to Mr. Dambro's assets?

18              THE COURT:  Sir, just answer that question.

19              THE WITNESS:  I don't recall.

20   BY MR. RAANAN:

21   Q.    Did you testify about his offshore accounts?

22   A.    I don't recall.

23   Q.    Did you testify about how much money the two of you

24   earned together?

25   A.    I think I did.
```

UNITED STATES DISTRICT COURT

34

Page 31

041307 #2.txt

1    Q.    And can you tell the jury how much money the two of you

2    earned together in the past?

3    A.    I think I told him how much the different opportunities

4    that I made because I wouldn't have known the specific

5    amounts that he made.  If you tell me what year, I can tell

6    you what I probably said.

7    Q.    1994 --

8              THE COURT:  Excuse me.  As I understand it, this is

9    a different question.  It's not what you testified to, but

10   counsel's question is how much --

11             MR. RAANAN:  How much money Mr. Vickery and

12   Mr. Dambro together earned.

13             THE COURT:  Over what time period?

14             MR. RAANAN:  And the witness asked what years and I

15   indicated 1994 would be a good start.

16             THE WITNESS:  I believe I made 4 to 600,000 in

17   1994.  I would assume he made the same amount as I did.

18             THE COURT:  Well, sir, we don't you want to assume.

19   And we don't want you to guess.  If you know how much money

20   he made in a particular year, you can say.

21             THE WITNESS:  I don't know how much money.

22             THE COURT:  If you don't know, you should say I

23   don't know.

24   BY MR. RAANAN:

25   Q.    Between '95 and 2005 when the two of you had various

                    UNITED STATES DISTRICT COURT

                                                              35


1    projects, do you have an estimate of what Mr. Dambro earned

2    all together?

                         Page 32

041307 #2.txt

3   A.   No.

4           MR. RAANAN:  That's all I have.

5           THE COURT:  All right.  Any questions?

6           MR. MCALLISTER:  No, Your Honor.

7           THE COURT:  Sir, do you wish to make a statement of

8   your own?

9           MR. VICKERY:  No.

10          THE COURT:  All right.  You may step down.  Any

11  additional witnesses to be called or evidence to be offered

12  from the plaintiffs.

13          MR. RAANAN:  No more witnesses.  Mr. Michael Dambro

14  is not here in court so we can't ask him any questions.  I

15  would ask Your Honor to accept Mr. Mike Dambro's unsigned

16  financial statement into evidence.  I'm sure counsel has seen

17  it because he provided it.

18          THE COURT:  Are you offering it as an exhibit?

19          MR. RAANAN:  Yes, 98.

20          THE COURT:  Any objection to it being received?

21          MR. MCALLISTER:  May I see it, Your Honor?

22          THE COURT:  Yes, please.

23          MR. MCALLISTER:  No objection.

24          THE COURT:  All right.  It's received.

25          (Exhibit 98 admitted.)


UNITED STATES DISTRICT COURT


36


1          THE COURT:  Any additional evidence to be offered

2  by the plaintiff?

3          MR. RAANAN:  Your Honor, at this point the

4  plaintiff is done and ready for closing argument.

Page 33

041307 #2.txt

5          THE COURT:  Any evidence to be offered by the

6     defense?

7               MR. MCALLISTER:  None, Your Honor.

8               THE COURT:  Mr. Vickery?

9               MR. VICKERY:  No, ma'am.

10              THE COURT:  All the evidence is in on the issue of

11    punitive damages.  Counsel will be given an opportunity to

12    argue about 5 minutes.

13              MR. RAANAN:  Your Honor, I will even make it

14    shorter.  First, we want to thank you again for participating

15    for two weeks.  The trustee, Mr. Kollitz and myself

16    appreciate the fact that you've given your time for two weeks

17    and there's nothing more valuable than time in many ways.

18    I'll make it short.  The plaintiffs have admitted that they

19    have offshore trust accounts.  The evidence is that they made

20    millions of dollars from various transactions, various

21    schemes certainly throughout the '90s and probably the 2000s,

22    although we didn't get into that.

23              One of the ways that a person who takes money,

24    steals money from someone else protect that is that they put

25    money offshore.  They put it in accounts where creditors,

UNITED STATES DISTRICT COURT

37

1     ultimately people who lost money to them simply can't reach

2     it.  You're going to look at the statements that they

3     provided before the trial started and you'll see what they

4     indicate their assets are.  I submit that they're not telling

5     you truth.  I submit they're not telling you everything that

6     happened.

Page 34

041307 #2.txt

7      Mr. David Dambro five years ago, six years ago was

8    involved in a divorce.  And there's nothing more revealing of

9    someone's assets then a divorce because your spouse at that

10    point, the person who probably knows you the best, manages to

11    get out what your assets are.  And it was a very contentious

12    proceeding.  And it turned out that Mr. Dambro at that time

13    had $3 million and that didn't include his foreign trust

14    assets.  The only thing I can tell you is we ourselves don't

15    know exactly how much they have.  We can't tell you how much

16    they made over the period of about 10 years in the '90s, but

17    it's millions.

18          And the focus I think should be both on how much

19    you think they actually hid and how much they have, but also

20    on the fact that their actions were so culpable, their

21    actions were so malicious.  The people who you saw really are

22    typical.  The average investor who was retired, the average

23    investor was gullible perhaps, but really impressionable.

24    When they got these calls, they believed that this was a

25    great opportunity for retirement.  They believed they would

UNITED STATES DISTRICT COURT

38

1    be able to take the money and actually do something in

2    retirement and they were fooled into it.  I want you to

3    consider that.

4          I want you to consider this as a punishment.

5    That's really what punitive damages are about is to tell

6    people who take advantage of others that we as a society just

7    won't accept it.  We as a society will not allow people to

8    take advantage of our citizens and certainly not our elderly.

Page 35

041307 #2.txt

9    They took millions of dollars from these people.

10         I ask you to award punitive damages to punish them

11    in the amount of two times the amount that you already

12    awarded.  That sends a message not just to these defendants,

13    but everyone in society that we as a society simply will not

14    accept it.  Thank you.

15         THE COURT:  Mr. McAllister.

16         MR. MCALLISTER:  May it please the Court, ladies

17    and gentlemen of the jury.  Needless to say on our side of

18    the courtroom we didn't expect this verdict.  And we've had a

19    very short period of time to assess it and -- but if my

20    mathematics is correct, you have already awarded $3,390,000.

21    I don't know if you intended that amount.  I don't know what

22    the basis is for that amount.  It certainly doesn't match up

23    with anything in the evidence, but it's your verdict.  You

24    have returned it.  We think it's wrong.  And I guess we'll

25    make a decision whether to go forward in court and contest it

UNITED STATES DISTRICT COURT

39

1    further.

2         But the reality is if these two defendants with

3    these lawyers with unlimited money $710,000 so far, and now I

4    don't know how much more they'll ask, if my clients had

5    money, they would have found it by now.  They've obviously

6    been watching my client for years and years.  The evidence,

7    though, before you is this.  There is a financial statement

8    that shows he has a negative net worth.  And the same is

9    basically true for Michael Dambro who is currently

10    unemployed, two children, and as I said couldn't afford to

Page 36

041307 #2.txt

11    pay me or couldn't afford to pay a lawyer in this case.

12         Your verdict thus far is an enormous $3,390,000

13    verdict.  And, you know, it's punishment in itself.  It's

14    what you decided.  I can no longer argue against it or try to

15    convince you otherwise.  But to add punitive damages is

16    really inappropriate.  There is an old story that a judge

17    once told me.  And that is if the newspaper boy takes the

18    newspaper and throws it up on your porch and he breaks the

19    window, then he should be entitled -- you should be entitled

20    to have the newspaper pay for the damaged window.

21         And if he throws it up there not to deliver you the

22    paper, but to, you know, do damage intentionally with an evil

23    maliciousness because he's mad at you or whatever, then

24    you're entitled not only to collect the cost of the broken

25    window, but also collect punitive damages even from the

UNITED STATES DISTRICT COURT

40

1    delivery boy.  But when you assess the damages, if the

2    delivery boy is just that, working for a living, maybe

3    assessing a dollar or $100 against him hurts.  And then again

4    if he's a multi-millionaire, then assessing millions of

5    dollars is appropriate.

6         And the Judge is going to give you once again an

7    instruction about this.  But the point here is my clients

8    don't have any money.  They spent everything they have

9    fighting this case.  And to at this point on top of what's

10   already been done just isn't just.  It's not right.

11        And there is an appeal here made by the plaintiff's

12   counsel oh, remember the victims, retired folks.  Keep in

Page 37

041307 #2.txt

13    mind Dave Dambro and Mike Dambro never took any money from
14    them.  Your verdict is about what was transferred to them.
15    They didn't lie to anybody.  They didn't misrepresent
16    anything to anybody.  And remember the evidence that Dave
17    Dambro has already lost a great deal of money because he
18    believed in this IVDS technology and what the FCC said.
19            Folks, it's about doing the right thing.  You've
20    reached a verdict.  Whether we agree with it or not, you've
21    done what you believed to be the right thing.  Is it just to
22    pile on top of that when these -- when my clients or all
23    these defendants don't have any money?  We urge you to award
24    no punitive damages or if you feel that a message has to be
25    sent, award a dollar.

UNITED STATES DISTRICT COURT

41

1            Don't let the trustee and the lawyers make even
2     more money off this case.  And don't be fooled by these
3     sympathy arguments about well, all of these folks were
4     elderly and lost money.  They didn't deal with my client.
5     They didn't lose money because of my client.  Thank you.
6             THE COURT:  Mr. Vickery.
7             MR. VICKERY:  Obviously, I'm not extremely happy
8     about the verdict, but through my faith if I have to pay it,
9     I'll pay it.  It's going to take me a long time, but that's
10    what I have to do.  So I just pray that if you don't think a
11    million dollars is enough to show the public that we're not
12    going -- to send a message, then I don't know what country I
13    live it.  I'm just asking you to say that's enough and look
14    at the case.  I think we didn't do anything wrong.  We could

Page 38

041307 #2.txt

15    fight it over and over.  I'm not polished attorney, but I

16    would say a million dollars is a lot of money.  And I'm just

17    going to pay it back when I can.  Thank you.

18              THE COURT:  The plaintiffs wish to be heard any

19    further?

20              MR. RAANAN:  No, Your Honor.

21              THE COURT:  All right.  I just have one instruction

22    to read to the jury and I believe that counsel have seen it

23    and take no exception to it.  The jury will consider all the

24    previous instructions that the Court has already read and I

25    think you still have the packet.  The other only instruction

UNITED STATES DISTRICT COURT

42

1     that I will add is the instruction that discusses punitive

2     damages it reads as follows.

3              Having found for the plaintiff, you may, but are

4     not required to award punitive damages.  The purposes of

5     punitive damages are not to compensate the plaintiff, but to

6     punish a defendant and to deter a defendant and others from

7     committing similar acts in the future.  The plaintiff has the

8     burden of proving that punitive damages should be awarded and

9     the amount by a preponderance of the evidence.  You may award

10    punitive damages only if you find the defendant's conduct was

11    malicious, oppressive or in reckless disregard of the

12    plaintiff's rights.

13              And you have found that by answering the special

14    verdict form did you find the conduct to be malicious?  You

15    said yes.  If you find the conduct to be in reckless

16    disregard of the plaintiff's rights under the circumstances,

Page 39

041307 #2.txt

17   you said yes.  And the other question was did you find the

18   conduct to be oppressive and you answered yes.

19        The Court previously defined those terms for you

20   and they are included in the jury instruction that you

21   already have which is Instruction No. 34.  So that's where

22   you would find the definitions and they're also included in

23   the instruction that I will give you now.

24        If you find that punitive damages are appropriate,

25   you must use reason in setting the amount.  Punitive damages,

UNITED STATES DISTRICT COURT

43

1   if any, should be in an amount sufficient to fulfill their

2   purposes, but not should reflect bias, prejudice or sympathy

3   toward any party.  In considering punitive damages, you may

4   consider the degree of reprehensibility of the defendants'

5   conduct and the relationship of any award of punitive damages

6   to any actual harm inflicted on the plaintiff.  You may

7   impose punitive damages against one or more of the defendants

8   and not others.  And you may award different amounts against

9   different defendants.

10        That does conclude the reading of the instructions.

11   As I said, the packet of instructions that I previously gave

12   to you may be considered in deciding issue of punitive

13   damages.  There are no additional exhibits to be considered

14   except those that were received into evidence during this

15   phase of the trial.  Mr. Levario will make those available to

16   you together with a verdict form.

17        You will be excused to deliberate.  And when you

18   have a verdict, you will sign the verdict form, date it,

Page 40

041307 #2.txt

19    indicate to the bailiff that you have reached a unanimous

20    decision because your decision must be unanimous.  Meaning

21    all of you must agree to the amounts, if any, that you decide

22    are appropriate for punitive damages.  You'll advise the

23    bailiff.  He will advise us, and then we'll bring you back

24    into the courtroom so the verdict can be received.  The jury

25    is excused at this point to deliberate on the issue of

UNITED STATES DISTRICT COURT

44

1    punitive damages.

2            (Recess.)

3            THE COURT:  Go back on the record.  The record

4    reflects we have the jurors in the box and everyone else is

5    here that should be here.  And I'm told that the jury has

6    reached a unanimous decision on the punitive damage phase; is

7    that correct?

8            JUROR CORTEZ:  Yes, ma'am.

9            THE COURT:  If you'll pass the verdict form to the

10    bailiff and he'll give it to the clerk and the clerk will

11    give it to me and I'll look at it.  I'll ask the clerk to

12    read the verdict form please.

13            THE CLERK:  Richard K. Diamond versus Digital

14    Interactive Associates.  Verdict form re punitive damages.

15            Do you the jury unanimously find that punitive

16    damages should be awarded on behalf of the plaintiff Richard

17    K. Diamond and against defendants:

18            1.  David J. Dambro:  Yes.

19            If yes, what amount?  The amount is $2 million.

20            2.  Market Dynamics Group:  No.

Page 41

041307 #2.txt

21       3.  Terry Vickery:  Yes.

22       If yes, what amount?  The amount is $1 million.

23       4.  Digital Interactive Associates, Incorporated:

24       No.

25       5.  Michael Dambro:  Yes.

UNITED STATES DISTRICT COURT

45

1        The amount is $500,000.

2        6 Market Logistics Group Incorporated:  No.

3        Dated April 13, 2007 and signed by the foreperson

4    Willie Cortez.  Ladies and gentlemen of the jury, is this

5    your verdict so say each of you, so say you all?

6        THE JURY:  Yes.

7        THE COURT:  Would you like to have the jury polled?

8        MR. MCALLISTER:  No, Your Honor.

9        MR. VICKERY:  No.

10       THE COURT:  Okay.  The clerk has brought to my

11   attention that the jurors actually made a change in one of

12   the amounts and so we'll return the verdict form just so the

13   foreperson can initial it.

14       At this time I'm going to thank and excuse the

15   jury.  We really do appreciate the time that you have given

16   the case.  The fact that you would sacrifice your time to

17   come and be part of this process.  Our system of justice

18   would not work if we did not have persons like yourselves who

19   were willing to come into a courthouse, listen to evidence,

20   deliberate, reach and return a verdict.  I know it's later

21   than you expected to leave today and I do appreciate your

22   willingness to stay and so we could get this done today.

Page 42

041307 #2.txt

23    You're now excused from this case.  The jury office
24    will contact you if there is any conversation that they need
25    to have with you or you may contact them if you have any

UNITED STATES DISTRICT COURT

46

1    questions concerning your next service.  I'm available to
2    talk to you.  I know it's late and so you're probably
3    thinking no, I need to go now and that's fine.
4         I'm available any time.  So if any of you were in
5    the courthouse or near the courthouse and wanted to speak
6    with me about the case, not how you reached your decision,
7    but anything that may have occurred from the time that you
8    were summoned to the time that you are leaving today, you may
9    have some questions about ways we could improve things, just
10   make it better for jurors for the future, I would be the
11   person that could deliver that message to those who could
12   make a change.
13        So if you should ever want to do this, just feel
14   free to stop by the courthouse and I will be happy to meet
15   with you or you can write to me.  You may not be coming to
16   the courthouse, but you may have some concerns about
17   something that happened while you were serving, something
18   that you want to communicate to the court.  I welcome that.
19   We're trying to make this a better system.  We're trying not
20   to waste your time.  We're trying to take advantage of your
21   time while you're here to get the job done.
22        We are happy for your assistance.  And you're now
23   excused and released from all admonitions previously given.
24   You can talk about the case with anyone involved in the case

Page 43

041307 #2.txt

25    or on any subject connected with the case.  Thank you very

UNITED STATES DISTRICT COURT

47

1    much for your service.

2              (Jury not present.)

3              THE COURT:  The jury has been excused so the

4    plaintiffs will prepare the form of judgment for the Court so

5    it can be entered.  And you will follow the local rules as

6    well as the Civil Rules of Procedure in terms of times for

7    filing motions.  I'm sure that there will be some post-trial

8    motion so just follow those rules in terms of noticing those

9    motions for hearing.  You're excused at this time.  Thank you

10   very much for your cooperation.

11             MR. MCALLISTER:  Thank you, Your Honor.  Despite

12   the outcome for my clients, it was a pleasure being in your

13   court.

14             MR. VICKERY:  I agree, Your Honor.  You're very

15   nice.

16             THE COURT:  Thank you.

17             MR. KOLLITZ:  Thank you as well, Your Honor.

18             THE COURT:  Thank you.

19             (Proceedings were concluded at 6:15 p.m.)

20

21

22

23

24

25

Page 44

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

DEC 23 2008

MOLLY C. DWYER, CLERK OF COURT
U.S. COURT OF APPEALS

| | |
|---|---|
| In re: IVDS INTERACTIVE ACQUISITION PARTNERS, | No.  07-55904 |
| Debtor, | D.C. No.  CV-00-09980-CBM |
| | Central District of California, Los Angeles |
| -------------------------------- | |
| RICHARD K. DIAMOND, as Chapter 7 Trustee, | **MANDATE** |
| Plaintiff - Appellee, | |
| V. | |
| DIGITAL INTERACTIVE ASSOCIATES, INC.; MARKET DYNAMICS GROUP INC.; MARKET LOGISTICS GROUP, INC.; TERRY K. VICKERY DOUGLAS ETHAN MALLACH; DAVID J. DAMBRO; | |
| Defendants, | |
| and | |
| MICHAEL DAMBRO, | |
| Defendant - Appellant. | |



| | |
|---|---|
| In re: IVDS INTERACTIVE ACQUISITION PARTNERS, | No.  07-55905 |
| Debtor, | D.C. No.  CV-00-09980-CBM |
| | Central District of California, Los Angeles |



------------------------------

RICHARD K. DIAMOND, as Chapter 7
Trustee,

       Plaintiff - Appellee,

  V.

DIGITAL INTERACTIVE
ASSOCIATES, INC.; MARKET
DYNAMICS GROUP INC.; MARKET
LOGISTICS GROUP, INC.; TERRY K.
VICKERY DOUGLAS ETHAN
MALLACH,

       Defendants,

MICHAEL DAMBRO,

       Defendant,

 and

DAVID J. DAMBRO,

       Defendant - Appellant.

**MANDATE**

    The judgment of this Court, entered 12/01/08, takes effect this date.

    This constitutes the formal mandate of this Court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure. Costs awarded to Appellee in the amount of $240.20.

FOR THE COURT:

Molly C. Dwyer
Clerk of Court


By: Rhonda Roberts
Deputy Clerk

**FILED**

**NOT FOR PUBLICATION**

DEC 01 2008

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| In the Matter of: IVDS INTERACTIVE ACQUISITION PARTNERS,<br><br>            Debtor, | No. 07-55904<br><br>D.C. No. CV-00-09980-CBM |
| RICHARD K. DIAMOND, as Chapter 7 Trustee,<br><br>            Plaintiff - Appellee,<br><br>      v.<br><br>DIGITAL INTERACTIVE ASSOCIATES, INC.; MARKET DYNAMICS GROUP, INC.; MARKET LOGISTICS GROUP, INC.; TERRY K. VICKERY; DOUGLAS ETHAN MALLACH; DAVID J. DAMBRO,<br><br>            Defendants,<br><br>  and<br><br>MICHAEL DAMBRO,<br><br>            Defendant - Appellant. | MEMORANDUM[*] |

---

[*]      This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

In re: IVDS INTERACTIVE
ACQUISITION PARTNERS,

         Debtor,

No. 07-55905

D.C. No. CV-00-09980-CBM

RICHARD K. DIAMOND, as Chapter 7
Trustee,

         Plaintiff - Appellee,

  v.

DIGITAL INTERACTIVE
ASSOCIATES, INC.; MARKET
DYNAMICS GROUP, INC.; MARKET
LOGISTICS GROUP, INC.; TERRY K.
VICKERY; DOUGLAS ETHAN
MALLACH; MICHAEL DAMBRO,

         Defendants,

  and

DAVID J. DAMBRO,

         Defendant - Appellant.

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, District Judge, Presiding

2

Submitted November 20, 2008[**]
Pasadena, California

Before: RYMER and M. SMITH, Circuit Judges, and KORMAN,[***] District Judge.

Defendants-Appellants Michael and David Dambro (the Dambros) appeal the district court's judgment, which held them jointly and severally liable for $3,600,000, and individually liable for punitive damages because of their participation in a conspiracy to commit a fraudulent transfer. Because the parties are familiar with the facts, we do not recount them here except as necessary to explain our decision. We have jurisdiction to hear this appeal under 28 U.S.C. § 158(d).

I.    **Failure to Preserve Challenge to the Sufficiency of the Evidence**

A party in a civil case must make motions under Fed. R. Civ. P. 50(a) and (b) in order to preserve a challenge to the sufficiency of the evidence in a jury trial. *Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007). The Dambros failed to do so in this case, and therefore waived the argument that they should not be liable because they were not individually transferees.

---

[**]    The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

[***]    The Honorable Edward R. Korman, Senior United States District Judge for the Eastern District of New York, sitting by designation.

3

## II.    The Remedy of Damages for Fraudulent Transfer

Damages are a permissible remedy for fraudulent transfer under federal and

Florida law. 11 U.S.C. § 550(a); Fla. Stat. Ann. § 726.108(1)(c)(3); *Hansard*

*Constr. Corp. v. Rite Aid of Fla. Inc.*, 783 So. 2d 307, 309 (Fla. Dist. Ct. App.

2001).

## III.    Applicability of Joint and Several Liability for Conspiracy to Make Fraudulent Transfers.

Joint and several liability is appropriate under Florida law against joint

tortfeasors acting in concert or through independent acts to produce a single injury.

*Acadia Partners, L.P. v. Tompkins*, 759 So. 2d 732, 736 (Fla. Dist. Ct. App. 2000).

Performing a fraudulent transfer is a tort. *Invo Florida, Inc. v. Somerset Venturer,*

*Inc.*, 751 So. 2d 1263, 1265 (Fla. Dist. Ct. App. 2000). Because the jury found that

the Dambros worked in concert with the other defendants to perform a fraudulent

transfer, joint and several liability is an appropriate remedy against them.

## IV.    Award for Punitive Damages

Issues brought for the first time on appeal are generally not considered by an

appellate court. *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). The Dambros'

failure to object to the jury instructions prevents consideration on appeal of their

argument that punitive damages are not available for a fraudulent transfer. *Larez v.*

4

*Los Angeles*, 946 F.2d 630, 639, 648 (9th Cir. 1991); *Hammer v. Gross*, 932 F.2d

842, 847 (9th Cir. 1991) (en banc).

The Dambros also failed to raise due process concerns at the district court

level. Even if we were to consider these concerns, however, the Dambros were not

prejudiced by the district court's failure to make a written record of its reasons for

accepting the punitive award per *Morgan v. Woessner*, 997 F.2d 1244, 1255 (9th

Cir. 1993). Failure to review a punitive award constitutes harmless error if "the

jury's verdict is more probably than not untainted by the error." *Cerrato v. San*

*Francisco Cmty. Coll. Dist.*, 26 F.3d 968, 974 (9th Cir. 1994). The award of

punitive damages was not grossly excessive in light of the conduct involved, and

the jury's verdict was more probably than not untainted by the alleged error.

AFFIRMED.

5